# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

─────────

No. 14-41408

─────────

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

MARCO ANTONIO OLARTE-ROJAS,

      Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

April 29, 2016

Lyle W. Cayce
Clerk

─────────

Appeal from the United States District Court
for the Southern District of Texas

─────────

Before DAVIS, SOUTHWICK, and COSTA, Circuit Judges.

W. EUGENE DAVIS:

Marco Antonio Olarte-Rojas pleaded guilty to one count of transportation of an alien within the United States by means of a motor vehicle for purposes of financial gain and was ultimately sentenced to 57 months of imprisonment with no supervised release. On appeal, he argues that he should not have received an enhancement for use of a dangerous weapon and that the district court had no jurisdiction to resentence him to correct its error in sentencing him the day before. For the reasons set forth below, we affirm.

## I.     Background

The presentence report ("PSR") set forth the following offense conduct: On August 20, 2014, Customs and Border Patrol agents patrolling an area near the Rio Grande River saw a man using a tarp to cover persons in the bed of a parked truck; the man noticed the agents and drove away. The agents tried to conduct a traffic stop, but the truck continued its flight. The agents, along with other law enforcement officers, pursued the truck for two miles. Agents saw a bucket being discarded from the truck and determined that the occupants of the truck had deployed caltrops, i.e., metal spikes that alien and drug traffickers often deploy during pursuits to puncture the tires of police units.

The caltrops disabled two law enforcement vehicles by puncturing the cars' tires; neither the agents in the disabled units nor other motorists were injured. The truck continued to flee until it crashed into a canal; multiple people were ejected from the truck. The driver of the truck, identified as Olarte-Rojas, fled on foot; agents captured him without incident. The truck was found to contain 19 undocumented aliens, 16 of whom required medical treatment due to the crash.

A number of the aliens were interviewed. The aliens stated that, with the help of an alien smuggling organization, they were moved across the Rio Grande River and into a truck. The aliens identified Olarte-Rojas as the driver. One alien, who was inside the cab of the truck, stated that, during the flight from agents, Olarte-Rojas instructed him to retrieve a bucket of caltrops; the caltrops then were tossed out of the truck.

Marco Antonio Olarte-Rojas pleaded guilty to one count of transportation of an alien within the United States by means of a motor vehicle for purposes of financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i). The probation officer assigned a base offense level of 12

under U.S.S.G. § 2L1.1. Olarte-Rojas was assessed the following upward adjustments: a six-level adjustment under § 2L1.1(b)(2)(A) because the offense involved fewer than 25 undocumented aliens; a two-level adjustment under § 2L1.1(b)(6) because the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person; a four-level level adjustment under § 2L1.1(b)(7)(B) because an undocumented alien sustained a serious bodily injury; and a two-level adjustment under U.S.S.G. § 3C1.2 because Olarte-Rojas recklessly created a substantial risk of death or serious bodily injury to another person while fleeing. Olarte-Rojas's resulting total offense level was 26. That offense level, combined with his criminal history category of I, yielded an advisory guidelines range of 63 to 78 months of imprisonment. *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

At sentencing, the district court concluded that the probation officer had miscalculated the enhancement that should apply under § 2L1.1(b)(2)(A) based on the number of aliens involved; the district court determined that the proper enhancement was three levels. The district court further found that Olarte-Rojas should be granted a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.

The district court also raised sua sponte the issue whether a four-level adjustment should apply under § 2L1.1(b)(5)(B) because a dangerous weapon was used, i.e., the caltrops. The court opted to apply the adjustment and "let the Fifth Circuit decide whether [caltrops were] a dangerous weapon." Olarte-Rojas contended, inter alia, that the adjustment should not apply because caltrops were not a dangerous weapon.

In light of the revised calculations at sentencing, the district court found that Olarte-Rojas's total offense level was 24, and his guidelines imprisonment

range was 51 to 63 months. The district court imposed a sentence of 54 months of imprisonment and no supervised release.

The following day, the district court reconvened the sentencing hearing under Federal Rule of Criminal Procedure 35(a). The district court indicated that it had miscalculated Olarte-Rojas's offense level and guidelines imprisonment range because it wrongly determined the applicable adjustment under § 2L1.1(b)(5)(B); the district court explained that the guideline instructs that application of the adjustment should result in a minimum offense level of 20, but the four-level adjustment applied at the initial sentencing yielded only an offense level of 19. The district court concluded that it should have assessed a five-level adjustment. The district court found that Olarte-Rojas's correct total offense level was 25 and that his proper guidelines imprisonment range was 57 to 71 months.

Over Olarte-Rojas's objection to whether the district court possessed the authority to resentence him, the district court found that a sentence within the revised guidelines range was appropriate. The district court thus sentenced Olarte-Rojas to 57 months of imprisonment with no supervised release. He filed a timely appeal, arguing that he should not have been subject to the dangerous weapon enhancement and that the district court had no jurisdiction to resentence him the day after entering the original sentence.

## II.   Analysis

### A.   Adjustment for Use of a Dangerous Weapon

Olarte-Rojas argues that he was wrongly assessed an adjustment under § 2L1.1(b)(5)(B) on the ground that the caltrops deployed against the pursuing agents were a dangerous weapon. He essentially contends that caltrops are not a weapon because they are only used defensively to hinder an enemy and are not dangerous because no death or serious bodily injury results from their use.

No. 14-41408

He also asserts that there was no evidence that the caltrops deployed in this case caused death or serious bodily injury and, therefore, the Government failed to satisfy its evidentiary burden.

This court reviews the district court's interpretation and application of the Sentencing Guidelines de novo and its factual findings for clear error.[1] In deciding whether an adjustment under the Guidelines should apply, a district court may draw reasonable inferences from the facts, and these inferences are findings of fact that are reviewed for clear error.[2] A factual finding is clearly erroneous if it is not plausible in light of the record as a whole.[3]

Section 2L1.1(b)(5)(B) states that "[i]f a dangerous weapon (including a firearm) was brandished or otherwise used, increase [the base offense level] by 4 levels, but if the resulting offense level is less than 20, increase to level 20." "Dangerous weapon" is defined by the Guidelines as (i) an instrument capable of inflicting death or serious bodily injury, or (ii) an object that is not an instrument that is capable of inflicting death or serious bodily injury but that closely resembles such an instrument or was used in a manner that created the impression that the object was such an instrument (e.g., the defendant, while committing a bank robbery, wrapped his hand in a towel to create the appearance of a gun).[4] "Serious bodily injury" is an injury involving "extreme physical pain or the protracted impairment of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or [ ] rehabilitation."[5]

---

[1] *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006).

[2] *Id.*

[3] *Id.*

[4] U.S.S.G. § 1B1.1, comment. (n.1(D)).

[5] § 1B1.1, comment. (n.1(L)).

No. 14-41408

We cannot find, and the parties do not cite, any case law in which this court or any other federal circuit court has considered whether a caltrop is a "dangerous weapon" for purposes of the Guidelines. However, in reviewing whether an object is a "dangerous weapon," this court seemingly has applied an expansive definition and included virtually any item that has the capacity, given the manner of its use, to endanger life or inflict great bodily injury. *See United States v. Nelson*, 262 F. App'x 589, 590 (5th Cir. 2008) (hot water); *United States v. Gedman,* No. 99-50523, 2000 WL 177903, 3 (5th Cir. Jan. 18, 2000) (fire extinguisher); *United States v. Coronado*, No. 91-6307, 1993 WL 18784, 3 (5th Cir. May 27, 1993) (shovel); *see also United States v. Morris*, 131 F.3d 1136, 1139 & n.4 (5th Cir. 1997) (indicating that ordinary objects have the capacity to inflict death or serious bodily injury; refusing to resolve whether the Guidelines require objects to be used in a certain manner to be "dangerous weapons"). Moreover, as this court has noted, other courts have held that, "in the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs." *United States v. Nunez-Granados*, 546 F. App'x 483, 486 (5th Cir. 2013) (citation omitted).

Olarte-Rojas contends that caltrops are not a weapon because they are "defensive in nature." He solely relies upon the "conventional definition" of "weapon," which, he asserts, requires that the object at issue be used offensively to attack another person; he cites a definition of "weapon" to support his contention. We do not believe the meaning of "weapon" is as limited as Olarte-Rojas asserts; "weapon" in general usage tends to include both instruments of attack and instruments of defense. Nevertheless, we cannot look to a general definition because the Guidelines define "dangerous weapon."

No. 14-41408

As noted above, the Guidelines define "dangerous weapon" as any item that has the capacity to inflict death or serious bodily injury, resembles such an item, or was used in a manner that suggested it was such an item. This definition, rather than focusing on whether the item was used offensively or defensively, focuses on how the object was employed or its potential, perceived or real, to cause a specific type of harm.[6] Case law suggests that, regardless of underlying intent (i.e., to attack or to defend), nearly any object can be a "dangerous weapon" depending on its manner of use and the nature of any injuries.[7] Other courts have held that objects that have a defensive function can be "dangerous weapons" in light of their use and the harm inflicted.[8]

The district court found that the caltrops used in this case were a "dangerous weapon," i.e., that they had the capacity to inflict death or serious bodily injury. The district court reviewed pictures offered by the Government showing, inter alia, the caltrops deployed, the bucket used to carry and deploy the caltrops, and the punctured tires of the units that were disabled as a result of the caltrops. The district court found that there is no difference between using caltrops and "shooting out the tires of law enforcement vehicles"; that caltrops are "illegal in this country in that they are a weapon"; that caltrops are more dangerous than many other items that are considered "dangerous

---

[6] § 1B1.1, comment. (n.1(D)).

[7] *See Nelson*, 262 F. App'x at 590; *Gedman*, 2000 WL 177903, at 3; *Coronado*, 1993 WL 185794, at 3 (rejecting claim that items designed for non-dangerous use cannot be dangerous weapons).

[8] *See United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1999) (pepper spray); *United States v. Bartolotta*, 153 F.3d 875, 879 (8th Cir.1998) (mace); *United States v. Dukovich* 11 F.3d 140, 142-43 (11th Cir. 1994) (tear gas); *but cf. United States v. Harris*, 44 F.3d 1206, 1216 (3rd Cir. 1995) (holding that Government did not produce reliable evidence showing that the pepper spray at issue was capable of causing death or bodily injury such that it was a "dangerous weapon"); *see also United States v. Perez*, 519 F. App'x 525, 525-26 (11th Cir. 2013) (same).

7

weapons" (e.g., baseball bats); and that caltrops have no use other than as a "defensive weapon."

The district court also adopted, in relevant part, the PSR, which noted that the use of caltrops in this case "posed reckless endangerment to [the pursuing officers or other motorists]," i.e., Olarte-Rojas, by deploying caltrops, created a substantial risk of death or serious bodily injury to another person during his flight from law enforcement.[9] At sentencing, the district court stated that the caltrops created a "substantial risk of serious bodily injury and death to other people, like law enforcement officers who are in high speed pursuit . . . to then have a blow-out." Olarte-Rojas did not object to this finding or offer any evidence to rebut or to undermine the reliability of the PSR.[10]

On appeal, Olarte-Rojas contends that, even if caltrops are a "weapon," they are not capable of inflicting death or serious bodily injury and, therefore, do not satisfy the definition of "dangerous weapon." As he correctly asserts, there was no evidence that the caltrops deployed in this case caused death or serious bodily injury; the PSR noted that "[n]o physical injuries to the pursuing officers or other motorists occurred." Also, while the record supports that the caltrops caused the tires of the law enforcement units to puncture to the extent that they were disabled, there is no indication that the drivers of the units lost control of the units on account of the caltrops, i.e., the units were not involved in an accident or a crash because of the caltrops.

However, the definition of "dangerous weapon" does not require that use of the instrument *actually* inflict death or serious bodily injury; the definition states only that the instrument be *capable* of inflicting death or serious bodily

---

[9] *See* U.S.S.G. § 3C1.2.

[10] *See United States v. Harris*, 702 F.3d 226, 230-31 (5th Cir. 2012).

injury.[11] Given the broad definition of "dangerous weapon" in the Guidelines, the similarly broad interpretation of that definition in case law, and the nature of caltrops, we conclude that they meet the Guidelines definition of "dangerous weapon" in this case. Olarte-Rojas deployed the caltrops to puncture the tires of vehicles engaged in a high speed pursuit. Common sense alone suggests that causing a blow-out at high speeds could easily lead to death or serious bodily injury, whether or not death or serious bodily injury actually resulted in this instance. Therefore, we affirm the district court's assessment of the enhancement under § 2L1.1(b)(5)(B) for use of a dangerous weapon based on Olarte-Rojas's deployment of caltrops.

### B.    The District Court's Authority to Resentence

Next, Olarte-Rojas contends that the district court did not have jurisdiction to resentence him and, thus, the sentence imposed at his resentencing is invalid. He argues that, although Federal Rule of Criminal Procedure 35(a) permits a sentencing court to correct certain errors within 14 days of sentencing, that rule does not apply in this case because the error corrected by the district court—i.e., an application of the Guidelines—is prohibited. Olarte-Rojas further argues that the Government cannot demonstrate that the error corrected under Rule 35(a) amounts to reversible plain error, which he maintains is the applicable standard of review for a resentencing under Rule 35(a). We disagree.

Rule 35(a) sets forth that, within 14 days after sentencing, the district court may correct a sentence that resulted from "arithmetical, technical, or other clear error." The narrow authority of the sentencing court to act under Rule 35(a) extends solely to "cases in which an obvious error or mistake has

---

[11] § 1B1.1, comment. (n.1(D)).

No. 14-41408

occurred in the sentence, that is, errors which would almost certainly result in a remand of the case to the trial court for further action."[12] Rule 35(a) is not designed for the court to reconsider the application or interpretation of the Guidelines or to change its mind about the propriety of a sentence, and should not be used to reopen issues previously resolved at sentencing "through the exercise of the court's discretion with regard to the application of the sentencing guidelines."[13] Misgivings about "the leniency or severity of the sentence" are not the type of error contemplated by Rule 35(a).[14] This court reviews de novo whether the district court had jurisdiction to resentence under Rule 35.[15]

Here, it is undisputed that, if Olarte-Rojas was subject to an adjustment under § 2L1.1(b)(5)(B), the district court erred at the original sentencing with respect to the calculation of his total offense level and guidelines imprisonment range. Specifically, the district court wrongly calculated the number of levels that Olarte-Rojas's offense level should be increased in light of the application of an adjustment under § 2L1.1(b)(5)(B).

As noted, Olarte-Rojas's base offense level was 12. After a three-level adjustment under § 2L1.1(b)(2)(A), his offense level was 15.[16] Section § 2L1.1(b)(5)(B) states that a four-level increase applies; however, if the resulting offense level is less than 20, the offense level should be increased to level 20. In this case, at the initial sentencing, the district court assessed a four-level adjustment under § 2L1.1(b)(5)(B), which resulted in an offense level of 19; the resulting offense level was less than 20 and, thus, the district court,

---

[12] FED. R. CRIM. P. 35, Advisory Committee's Notes (1991 Amendments).

[13] *Id.*

[14] *United States v. Ross,* 557 F.3d 237, 239 (5th Cir. 2009).

[15] *See Ross*, 557 F.3d at 239.

[16] *See* § 1B1.1(a)(2) (indicating that courts should apply base offense level and specific offense characteristics in the order listed).

10

according to the express dictates of § 2L1.1(b)(5)(B), should have increased the offense level to 20.

The failure of the district court to apply the proper increase caused the guidelines sentencing range to be calculated erroneously; the district court found that the applicable guidelines range of imprisonment was 51 to 63 months. The district court sentenced Olarte-Rojas within the incorrect guidelines range to 54 months of imprisonment. At resentencing, the district court identified its error and noted that it wrongly had assessed only a four-level adjustment under § 2L1.1(b)(5)(B); the district court indicated that it "need[ed] to bump [Olarte-Rojas] to a Level 20" if it concluded that he used a dangerous weapon. The district court stated that it "[made] a computational error which is somewhat mathematical in that [it] added four points" and should have increased Olarte-Rojas's offense level by five levels. The district court also noted that it made "a mistake of law" by wrongly reading and applying § 2L1.1(b)(5)(B). After applying the required five-level adjustment, the district court found that the proper total offense level was 25 and that the applicable guidelines range of imprisonment was 57 to 71 months. The district court found that a within-guidelines sentence was proper and sentenced Olarte-Rojas to 57 months of imprisonment.

Olarte-Rojas argues that the district court lacked jurisdiction to correct his sentence in light of the express language of the Advisory Committee's notes to Rule 35, which state that Rule 35(a) is not meant to provide an opportunity for the sentencing court to reconsider the application or interpretation of the Guidelines. This argument, however, is misguided. Here, the district court did not reexamine whether a guideline should be applied, reevaluate the application of a guideline that was subject to interpretation, reconsider calculations made under the appropriate guidelines range, seek to alter the

sentence because of a disagreement with a guideline, or reconsider whether the sentence was a proper exercise of its discretion.[17] Instead, the district court identified that, in applying § 2L1.1(b)(5)(B), it contravened the express language of the guideline, assessed a numerically incorrect adjustment that was contrary to the dictates of the guideline, and wrongly calculated the total offense level and guidelines range.

The error committed by the district court, however it is characterized, is the type of error that can be corrected under Rule 35(a). The district court, by incorrectly ascertaining how § 2L1.1(b)(5)(B) should apply, imposed a sentence that improperly reflected the advisory guidelines range; the original sentence was fashioned based upon a misapprehension of the explicit prescriptions of § 2L1.1(b)(5)(B), and the district court therefore did not review the applicable guidelines range when selecting the sentence to impose.

The procedure to be followed with regard to sentencing begins with the court making a correct determination of the applicable guidelines range.[18] The Supreme Court expressly directed that, in reviewing a district court's sentencing decision, the courts of appeals "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range."[19] While the Guidelines are advisory in light of *United States v. Booker*, 543 U.S. 220 (2005), district courts still must properly calculate the applicable guidelines range before imposing a sentence.[20]

---

[17] *See Ross*, 557 F.3d at 243; *United States v. Bridges*, 116 F.3d 1110, 1112 (5th Cir. 1997); *United States v. Lopez*, 26 F.3d 512, 520 (5th Cir. 1994).

[18] *See United States v. Ibarra-Luna*, 628 F.3d 712, 713 (5th Cir. 2010) (indicating that a district court must correctly calculate the applicable guidelines range before imposing sentence) (citation omitted).

[19] *Gall v. United States*, 552 U.S. 38, 51 (2007).

[20] *See* § 3553(a)(4); *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005).

The incorrect application of the Guidelines that results in an erroneous calculation of the total offense level and the guidelines sentencing range is an obvious error or mistake that almost certainly would result in a remand.[21] Other circuit courts have held that analogous sentencing errors can be addressed under Rule 35(a).[22] Thus, the error committed in this case is a paradigmatic example of the type of error that Rule 35(a) was intended to address, and Olarte-Rojas cannot show that the district court lacked jurisdiction under Rule 35(a) to resentence him.

Because we conclude that the district court properly applied an adjustment pursuant to § 2L1.1(b)(5)(B), we also conclude the district court was right to correct its error in calculating Olarte-Rojas's total offense level and advisory guidelines range by vacating the initial sentence and resentencing him.

AFFIRMED.

---

[21] FED. R. CRIM. P. 35, Advisory Committee's Notes (1991 Amendments); *United States v. Rowell*, No. 99-20731, 2000 WL 1056137, 1 (5th Cir. July 21, 2000); *see also Delgado-Martinez*, 564 F.3d at 753 (indicating that sentences resulting from procedural error must be remanded unless the error did not affect selection of sentence).

[22] *See United States v. Fawcett*, 522 F. App'x 644, 653 (11th Cir. 2013); *United States v. Ross*, 413 F. App'x 457, 461-62 (3d Cir. 2011); *United States v. Mitchell*, 376 F. App'x 749, 751 (9th Cir. 2010); *United States v. Quijada*, 146 F. App'x 958, 970-71 (10th Cir. 2005); *see also United States v. Waters*, 84 F.3d 86, 89-91 (2d Cir. 1996) (affirming corrected sentence where district court clearly erred by failing to consider U.S.S.G. § 7B1.3(e)).